UNITED STATES of America, Libelant,

v.

An Undetermined Number of Shipping Packages * * * Labeled in Part: * * * "VITASAFE FORMULA M" "Vitasafe Formula W" "Vitasafe CF" "Vitasafe Queen Formula with Royal Jelly Supplement for Women", etc., Claimant.

Civ. No. 875-60.

United States District Court
D. New Jersey.
Jan. 24, 1964.

As Amended Feb. 5, 1964.

David M. Satz, Jr., U. S. Atty. for District of New Jersey, by William E. Brennan, Attorney, Department of Health, Education and Welfare, for libelant.

Bass & Friend, New York City, by Milton Bass, New York City, for claimant.

LANE, District Judge.

This action, which arises under the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 301 et seq., was initiated by the government's filing of a libel of information in this court wherein the United States, having seized a quantity of vitamin and mineral capsules and labeling for the articles located at Middlesex, New Jersey, under powers granted the United States by 21 U.S.C. § 334, sought to have these articles condemned. The items were in the possession of the Vitasafe Corporation, Division of Consolidated Sun Ray, Inc., and also in the possession of the United States Post Office after delivery for shipment in interstate commerce. The asserted ground for seizure was that the designated articles were misbranded within the meaning of 21 U.S.C. §§ 343(a), 352(a), and 352 (f) (1). The items were concededly introduced into and traveling in interstate commerce within the meaning of the act.

Pursuant to monition, there were seized at the Vitasafe Corporation's premises 906 packages containing Vitasafe capsules, and approximately 3,730,000 pieces of written, printed, and graphic material designed to promote the sale of the Vitasafe capsules.

The libel was amended to specifically include the products "Vitasafe CF" and "Vitasafe Queen Formula with Royal Jelly Supplement for Women," by name, which were found at the premises of Claimant when the monition was executed. A further amendment was allowed pursuant to Rule 15(a) of the Federal Rules of Civil Procedure, so as to include the allegation that the seized articles were misbranded while held for sale after shipment in interstate commerce, as well as when introduced into and while in interstate commerce.

The United States alleges that the Vitasafe capsule, *as an article of food* within the meaning of 21 U.S.C. § 321 (f), is misbranded under 21 U.S.C. 343 (a) in that:

I. Its labeling, when viewed as a whole, represents, suggests and implies that the nutritional needs for men and women differ, and that the "Formula M" capsules are designed to satisfy the special needs of men as contrasted to the "Formula W" capsules which are designed to satisfy the special needs of women, which representations, suggestions, and implications are contrary to fact;

II. The listing on the label of, and references in the labeling to, certain ingredients implies and suggests that the nutritional value of Vitasafe capsules is enhanced by the presence of such ingredients, when in fact such implications and suggestions are false and misleading in that the presence of these ingredients is of no nutritional significance for dietary supplementation. The ingredients so listed are: vitamin K (menadione), rutin, lemon bioflavonoid complex, monopotassium glutamate, l-lysine monohydrochloride, dessicated liver, sodium caseinate, leucine, lysine, caline, histidine, isoleucine, phenylalanine, threonine, tryptophane, manganese, potassium, zinc,

magnesium, sulfur, calcium, and phosphorous.

III. The statements in the labeling to the effect that the quoted "Minimum Adult Daily Requirements" (MDR) are a recommendation of the Food and Nutrition Board, National Academy of Science—National Research Council, are false and misleading because the Food and Nutrition Board has not recommended any "Minimum Daily Requirements" but has established "Recommended Dietary Allowances" (RDA) which differ from the MDR and are not the allowances designated in the labeling as the "Minimum Daily Requirements."

IV. The overall impression suggested and implied by the statements in the labeling concerning the large amounts of common foods that must be consumed in order to furnish quantities of nutrients equal to the quantities of such nutrients present in one Vitasafe capsule is false and misleading since such large quantities of food would not be needed to supply the necessary dietary requirements for these nutrients and since the labeling does not list all the various nutrients furnished by the stated quantities of food designated in the labeling.

It is further alleged that the Vitasafe capsule, *as a drug* within the meaning of 21 U.S.C. § 321(g) is misbranded under 21 U.S.C. § 352(a) in that:

V. Its labeling contains false and misleading representations, suggestions, and implications that the article is an adequate and effective treatment for depression, tension, weakness, nervous disorders, lethargy, lack of energy, lassitude, impotence, aches and pains, aging, impaired digestion, loss of appetite, skin infections, lesions and scaliness, night blindness, photophobia, fatigue, headache, insomnia, diarrhea, edema of the legs, hypersensitivity to noise, swelling, redness, soreness and burning of the tongue, impairment of memory, inability to concentrate, dermatitis, cracking of the lips, lesions at the corners of the mouth, growth failure in children, sore, swollen and bleeding gums, defective calcification of the bones, lowered resist-

ance to disease and lowered vitality, which representations, suggestions, and implications are false and misleading since the article is not an adequate and effective treatment for the disease conditions and symptoms as stated and implied.

VI. Its labeling contains false and misleading representations, suggestions, and implications that practically everyone in this country is suffering from or is in danger of suffering from a dietary deficiency of vitamins, minerals and proteins which is likely to result in specific deficiency diseases, such as scurvy, as well as a great number of non-specific symptoms and conditions, which threatened deficiency is represented as being due to loss of nutritive value of food by reason of the soil on which the food is grown, and the storage, processing, and cooking of the foods, which representations, suggestions, and implications are false and misleading since they are contrary to fact.

It is further alleged that the article was misbranded within the meaning of 21 U.S.C. § 352(f) (1) in that its labeling fails to bear adequate directions for use of the article as a "lipotropic factor" which it is represented to be.

Claimant denies the essential allegations of misbranding and has moved for the dismissal of this action on the grounds that the large amounts of promotional material seized pursuant to monition were illegally seized since they do not constitute "labeling" within the meaning of the act.

■■■ This court has held that the approximately 3,730,000 pieces of written, printed and graphic matter are labeling within the meaning of 21 U.S.C. § 321 (m) and were properly seized. The

memorandum opinion dated April 16, 1962, setting forth this decision [1] is incorporated by and made a part of this opinion.

The issues before the court as defined in the pretrial order and as argued at the trial are:

(1) Does the labeling of the seized *res* make the representations, suggestions, and implications as alleged in the amended libel of information?

(2) Are any of these representations, suggestions, and implications false or misleading in any particular within the meaning of 21 U.S.C. §§ 343(a) and 352 (a)?

(3) Does the labeling of the seized article bear adequate directions for use of the article as a "lipotropic factor" as required by 21 U.S.C. § 352(f) (1)?

The evidence adduced at trial consisted wholly of real proof and expert testimony. The real proof offered by the government was extensive. It consisted of some forty-seven samples of literature seized which, together with the vitamin capsules, constituted parts of claimant's integrated sales and distribution program. The exhibits were, for the most part, elaborate advertising circulars directed to the general public and correspondence to prospective or present customers. They proclaim the various asserted virtues of the Vitasafe product, and are often accompanied by pictures representing the plight of vitamin-deficient sufferers before Vitasafe, the happy results of the Vitasafe treatment, doctors presumably in wholehearted agreement with the claims made, the capsules themselves, and like subjects.

Also offered as proof were four plastic canisters containing vitamins, on the exterior of which appear a list of "ingredi-

---

1. In that opinion, rendered from the bench, we held *inter alia* that the Vitasafe advertising circulars seized by the government were labeling within the meaning of the Act, since used and designed solely for the purpose of increasing the sale and use of the product; a part of the integrated system of distribution used by claimant in marketing subject capsules.

Physical proximity of the advertising to the product in question is not necessary for a finding that the advertising is labeling thereof. United States v. 8 Cartons, Containing "Plantation 'The Original' etc., Molasses," 103 F.Supp. 626 (W.D.N.Y., 1957), United States v. 353 Cases· Mountain Valley Mineral Water, 247 F.2d 473 (8th Cir. 1957).

ents" and minimum daily requirements of same, along with the name of the product, the corporation distributing it, number of capsules contained, et cetera.

The prime evidence offered by both parties was the testimony of experts whose function was to assist the court in establishing the character of the labeling's impression on those who read it, the truth of the labeling thus understood, and the adequacy of the directions for use of the product as a "lipotropic factor." A careful evaluation of this expertise is necessary for the proper determination of this case.

The first witness called by the government was Gottfried M. Hochbaum, Chief of the Behavioral Science Section of the United States Public Health Service, a psychologist by profession.[2] Dr. Hochbaum's area of expertise may be generally described as the relationship between public relations and public health. He explained his work thus:

"Some of our research was designed to identify factors which determine under what conditions people will or will not do certain things about their health as recommended by physicians, for example, why patients may not follow a doctor's prescription as to diets, toward exercises and other things; why people would or would not, and under what conditions people turn to a physician to help or other sources, pharmacists, neighbors, or anyone else. So, much of our research has dealt with identifying such factors.

"Other research focused on communication, particularly communication in the health area. That is, how do people acquire information or misinformation in the health area, how do they develop certain habits from brushing their teeth to certain nutritional habits and others.

"And thirdly, we have carried out research on how this knowledge can be translated in improving the education of the public in the health area, which involves communication, change of attitudes and habits, and so forth."

Dr. Hochbaum was eminently well qualified to testify to the type of consumer at which Vitasafe's advertising was directed and to give an expert opinion on the content of the labeling, as it is understood by these people.

Dr. Hochbaum characterized the various forms of advertising engaged in by claimant company as material which would probably be discarded by people with a reasonable amount of intelligence and education. But, on the other hand, it would be read by people who are in the low socio-economic level; people in the habit of reading pulp magazines of the "True Love Stories" variety. He noted that these magazines use the same type of pictures and headlines in the same style as used in subject advertising material. It was the doctor's opinion that the type of woman who reads these pulp magazines would, upon examining the advertising material here in evidence " * * * identify with the women in these pictures, * * * immediately connect [the problems illustrated in the advertising] with their own problems, because that is the way they have been used to reading these stories. They would immediately see in those headlines some of the problems they, themselves, experience, frustrations, marital problems, and so forth. A lot of these features would attract their attention and arouse their interest in reading on."

Dr. Hochbaum, in answer to a question of the court, agreed that he was referring to material like C–1 of Exhibit G–1 wherein is displayed five headlines with pictures of a girl or a girl and a man. One reads, "I couldn't stop torturing him," and another, "Our fights have turned to kisses." There is also a picture of a couple, presumably husband

2. B.A., American University, Washington, D.C.; M.A., George Washington University, Washington, D.C., Ph.D., University of Minnesota. Employed by United States Public Health Service, 1952-date. Many periods of service with committees inquiring into public health and the behavioral sciences.

and wife, he being stretched out on a couch. The headline is, "I'm worried. * * * My husband's idea of a good time—sleeping all day Sunday."

The doctor testified:

" * * * I believe that this kind of material would arouse the interest of many people who suffer from real or imaginary complaints, these vague variety of complaints such as tiredness, nervousness, real or imaginary, sexual impotence, marital problems, and so forth, because many of these people with little education who are very naive cannot identify the causes of their difficulties, and because they cannot * * *, they look for some magic formula, something that will change their lives and satisfy all their needs and remove their frustrations, so they turn to something like this with the real hope that this would provide a solution to their problems. And everything in here is in the form that would appeal to exactly this kind of people, attract these kinds of readers."

In evaluating the very many ailments that claimant's advertising lists under "Some Examples of What Lack of Vitamins and Minerals Can Mean," Dr. Hochbaum stated that people who can be expected to read such material would begin to identify themselves with the various ailments listed. As they read down the list and come to symptoms which do not particularly fit them, they are likely to acquire an attitude of susceptibility to suggestion and say, for example, "Come to think of it, last week my tongue did feel a little swollen." Thus, they are caught in this net that is thrown out in the form of a listed multitude of symptoms. He stated that the advertising techniques used by claimant company are those employed in many similar fields and that in devising and using such techniques, psychologists and various market consulting firms may well have been employed.

Further, Dr. Hochbaum testified that Vitasafe's offer of different "plans" for men and women implied to the average reader, unequipped to know the truth of the implication, that the nutritional needs of men and women are significantly different and that different kinds of nutritional treatment are therefore required. In this context, moreover, the term "high-potency capsule" implies that the consumption of the products will effect marital adjustment in some positive way.

The second expert witness for the government was Milton Wight Taylor, Professor of Biochemistry and Chairman of the Department of Agricultural Biochemistry at Rutgers University since 1954.[3] He is a member of many professional societies and has authored some 50 technical papers in the field of nutrition.

Dr. Taylor's testimony was that the literal language of Vitasafe advertisement Exhibit G–1(H) asserts that the consumption of any one of four or five foods in the groups shown would provide the user with the amount of the listed vitamin contained in the Vitasafe capsules. But the average reader might well assume that all the food pictured must be eaten to provide the vitamin equivalents in his diet. And the witness stated that an individual who ate one selection of each of the groups of foods connected to a vitamin would receive a good deal more than listed in the capsule because many of the foods listed are sources of many other vitamins and minerals; that a consumer who is receiving by means of his regular diet the average value in any particular vitamin would be receiving no benefit from additional vitamins contained in Vitasafe capsules; and that various vitamins listed in the advertising of claimant company, while essential in diets, show amounts so infinitesimal com-

---

3. B.A.. Agricultural Chemistry, University of Massachusetts, 1925; M.S., Agricultural Chemistry, Iowa State University, 1927; Ph.D., Agricultural Chemistry, Iowa State University, 1930; Association with Rutgers University, 1930-date.

pared with the amounts contained in regular diets that the capsule ingredients could not possibly be of any benefit to consumers.

Dr. Taylor asserted that excessive vitamins over the minimum daily requirement are, at best, of no benefit and that adding additional amounts of water-soluble vitamins, vitamin B–2 for example, to a diet already containing adequate quantities of the vitamin, merely results in excretion of the excess. With reference to claimant company's advertising he states that Exhibit G–1 (H–1) depicts a quantity of carrots which would probably supply in the neighborhood of twenty to thirty times the requirement of vitamin A. But, carrots are not depicted in claimant company's advertising as a source of vitamin A, but rather as a source of vitamin E,—and yet carrots are not an outstanding source of vitamin E. In this connection, he said:

"Almost without exception the foods contain other nutrients besides the ones which are shown in the exhibit. It is almost impossible to get foods which do not contain several nutrients. It is very difficult, when we are working with experimental rations, to produce such things. We can use things like starch or sugar and synthetic vitamins, minerals. We do not use natural foods, because they contain so many things."

The witness further stated that a vitamin capsule would provide nothing that is needed by the consumer if he is an average American eating average meals. Only if his diet were unusual and restricted, like an elderly person surviving on little more than tea and toast, would the consumer materially benefit from a Vitasafe capsule.

Dr. Taylor examined Exhibit G–1 (C–1), a portion of claimant company's advertising in which it is claimed that nutritional values are lost in the process of cooking, as much as 80% of certain vitamins being destroyed. While he agreed that there is some loss in cooking and processing, he said that this is not of great significance in American nutrition. He pointed out that most of the tables of food values have been worked out based on food values for cooked foods in which losses have already occurred and have therefore been taken into consideration.

Dr. Taylor, in explaining his position that a subscriber to Vitasafe products would in all probability receive no value at all in using them, testified:

"THE COURT: Do I understand your testimony, Doctor, that it is your opinion that if a member of the public responded to any one of these ads of Vitasafe that are on exhibit here and sent a check for $8.66, or whatever it may call for, $2.38, and received a bottle of Vitasafe tablets or a series of them and consumed one each day or as many as prescribed or suggested in the Vitasafe literature, that that person is in essence getting no value at all for the money sent to the Vitasafe Company?

"THE WITNESS: I would say that is true of most people but I still say that there are some people who might be benefited, if they are on a poor diet or for some reason they have unusually high requirements.

"If I may enlarge a little bit, I look on this—and I think this is true of many nutritionists—as insurance. I have questioned some of my associates, and they say, 'Yes, I take vitamins, even though I believe my diet may be adequate, as insurance. I don't take, perhaps, the full dose.' So that I would have no complaint with a person taking vitamins of this nature as insurance, just in case. But the fact still remains that they probably are not doing any benefit."

In a discussion of tables listed as Recommended Daily Allowances and Minimum Daily Requirements, it was testified by the witness that both have considerable safety margins. But while three or four per cent of the population's diet

would be below the MDR, some forty per cent is below the RDA. Thus, RDA and MDR are different, the RDA being estimated with a far greater safety margin.

"I think the MDR is, again, a very conservative estimate. By that I mean people do not want to err on the side of setting the requirement too low. That they don't want to do. Therefore even these so-called minimum daily requirements have a margin of safety."

Dr. Taylor said that there is a slight difference in the nutritional needs of men and women, particularly in thiamin or vitamin B–1, since this is roughly proportional to the amount of energy, particularly carbohydrate in the diet. He notes, however, that in defendant company's advertising, the amount of thiamin in the Vitasafe capsules is the same in the men's formula as in the women's formula.

The next witness was Dr. Paul Gyorgy, an eminent physician and nutritionist, now chairman of the department of pediatrics, Philadelphia General Hospital, and Professor Emeritus of Pediatrics, School of Medicine, University of Pennsylvania.[4]

Dr. Gyorgy testified that dietary allowances are not synonymous with requirements, but rather allowances that would be adequate for maintenance of food nutrition in essentially all the population of the United States. These are allowances designed to maintain good nutrition in healthy persons in the United States under current conditions of living and to cover nearly all variations of the requirements for nutrients in the population at large. They are

meant to afford a margin of sufficiency above minimal requirements, and persons who do not receive them would not necessarily suffer from malnutrition.

With regard to nutritional needs for a normally healthy woman, as opposed to that of a normally healthy man, he stated:

"The recommended dietary allowances make such difference, but related mainly to the lower average weight, size of the body, caloric intake, protein intake is lower, other considerations of the food generally are not lower, and during the childbearing age, the iron intake is slightly higher, but otherwise there is no difference."

And he states it would make no difference whether a man or a woman consumed the vitamin capsule that defendant company advertises as prepared for woman or that the company advertises as prepared for man. Claimant's capsules, in any form, would not have any effect in any normal person. This witness did not believe that healthy people ranging from young children up to people of old age need a vitamin supplement, and he would only recommend vitamins for young infants and for persons of old age who are not on the best diet, in addition to lactating or pregnant women.

In connection with defendant company's listing as ingredients in its product, bioflavonoid, rutin, sulfur, magnesium, zinc, molybdenum, cobalt, copper, potassium and phosphorus, in the amounts given in the advertising put out by claimant company, he states emphatically that all are irrelevant since they are absolutely insufficient to correct or tend to correct any possible deficiency. Further, he is of the opinion that a lay-

---

4. Educated in Hungary, at University and Medical School; Professor of Pediatrics, University of Heidelberg; Research Fellow at Cambridge University, 1933–1935; Associate Professor, Western Reserve University Medical School; Professor of Pediatrics, University of Pennsylvania Medical School, 1955–1957. Consultant to Surgeon General of the Army, World War II—present. Member and past president, American Institute of Nutrition. Winner of many awards in field of nutrition. American Medical Association awards six "Paul Gyorgy Fellowships" for medical students. Discoverer of riboflavin, vitamin B-2, vitamin B-6 and codiscoverer of three other B vitamins. Author of nearly 400 publications concerning nutrition in man.

man cannot possibly diagnose in himself any vitamin, mineral or protein deficiency.

Dr. Victor Daniel Herbert, an associate in medicine and tutor in medical science at Harvard Medical School, was next called by the government.[5] He testified that the likelihood of various complaints referred to in claimant company's literature being due to a vitamin or mineral deficiency is infinitesimally small. Thus, he stated as to complaints such as depression, tension, weakness, impaired digestion, dermatitis, night blindness, photophobia, headaches, insomnia, diarrhea, swollen, burning tongue, impairment of memory, cracking of lips and lesions at the corners of the mouth, growth failure in children, sore, swollen and bleeding gums, impotency, edema of the legs, that there is little likelihood in America of their being caused by vitamin or mineral deficiency.

Dr. Herbert stated that a "lipotropic factor" is a substance involved in the body's mobilization of fat, primarily in the liver, and, in his opinion, there is no normal need to supplement the human diet with any lipotropic factor. Further, for an individual to determine whether he has a liver ailment and the extent of it, he would require at a minimum four years of medical school training and a liver biopsy. Dr. Herbert's testimony was similar with regard to the cause of

sore, swollen, or bleeding gums and tumors of the brain, and the training needed to determine whether or not such conditions resulted from vitamin deficiency.

Dr. Herbert was asked whether three or four per cent of the American population have a deficiency of vitamins as measured by the minimum daily requirements. He answered:

"I think it is quite possible that three or four per cent of a population may be ingesting less than the MDR of one or more of the vitamins listed here. However, in studies on this point which have been conducted indicating such a percentage, it has not been established that that amount less than the MDR resulted in a vitamin deficiency, because the MDR actually is in excess of need. It is generally accepted minimal safe dose, rather than absolute minimum.

"When all the cases of vitamin deficiency reported in the United States in a single year are added up, they do not reach the figure of 20,000, and therefore the clinically ascertainable incidence as manifested by published reports is much less than 1 per cent; 20,000 projected into a figure of 180,000,000.

Attorney for claimant first called Dr. Harold Yacowitz, a nutritionist,[6] who

5. B.S., Columbia, M.D., Columbia University, College of Physicians and Surgeons, 1952. Specialist in internal medicine, emphasis: nutrition and hematology. Intern and assistant ward officer at the Walter Reed Army Medical Center, 1952–1953, Senior Research fellow of the New York Heart Association, one year. Fellow in hematology, Montefiore Hospital, New York, 1958–1959. Research assistant, Department of Hematology, Mount Sinai Hospital, New York, one year. Member, faculty in medicine at Harvard Medical School, to present. Research papers published: primarily related to vitamin B-12 and folic acid; also calcium metabolism and ascorbate metabolism. Work also with thiamin, riboflavin, niacin, and pyridoxine. (Publication total approximately 60 papers.) Diagnostician and attending

physician at Boston City Hospital in connection with particular diagnostic and therapeutic problems.

6. B.S., M.S., Ph.D. in nutrition, Cornell University. Over forty papers in the field of nutrition, only one of which relates to human nutrition, his particular specialty being experimental research in nutrition with animals, primarily poultry. Four years Associate Professor of Health Education, Ohio State University. Presently teaching course in health education at Fairleigh Dickinson University. Four years in charge of nutritional research for Squibb Institute of Medical Research, New Brunswick. One and one-half years Director of Applied Research for the Nopco Chemical Company, as well as a year as a research biochemist at Parke-Davis. Membership in various chemical

testified that we do have a problem with vitamin deficiency in the United States; that in general about forty to fifty per cent of the population does not meet the daily recommended allowances; and that some three or four per cent of the population would, in his opinion, fall in the category of actually suffering from nutritional deficiencies to a dangerous degree. He stated that the primary reasons for problems in nutrition are: (1) lack of knowledge of nutrition; (2) poor dietary habits among teenagers; (3) food faddism among women; (4) increased longevity; (5) dental problems in older people; and (6) loss of vitamins in food preparation and cooking.

Dr. Yacowitz, in reviewing subject labeling, states that the symptoms listed in relation to vitamin deficiency such as skin infection, lesions of the skin, rough, dry skin, nutritional night blindness and sensitivity to bright light, are recognized symptoms by experts in the field and that the taking of a Vitasafe capsule each day would afford some protection to a person against the occurrence of such symptoms.

With reference to claimant labeling which shows plates of food in connection with various types of vitamins, the doctor testified that it is worded in the disjunctive; any of the foods listed—not all of them—would match the Vitasafe capsule's content.

Dr. Yacowitz expressed the opinion that there is a difference in the nutritional needs between men and women, the difference being largely in the requirements of vitamin B.

On cross-examination, when asked to testify regarding the extent of work he has done personally in the area of research on the state of nutritional well-being of the American today, the witness answered that his experience on nutritional surveys had been minimal, and he based most of his statements on the work of authorities in the field. He subscribes to the accepted principle that generalization of nutritional survey findings as a basis for vitamin supplementation of healthy individuals is improper. It is necessary for a physician to evaluate each person individually, and that correction of an inadequacy should then be instituted, preferably by means of proper diet, although supplements by vitamin may be necessary until dietary adjustments are made and the body stores repleted. Finally, he expressed the opinion that, as a nutritionist, the average diet of Americans takes care of any nutritional differences between men and women.[7]

## FINDINGS OF FACT

A study of all the exhibits and the expert testimony outlined above leads this court to the following conclusions:

1. The labeling of the seized article, when viewed as a whole, does represent, suggest and imply that a woman, because of sex alone, has different nutritional needs than a man, and "Vitasafe Formula W" will satisfy these special needs of women as contrasted to "Vitasafe Formula M" which will satisfy the special needs of men.

These representations are false and misleading since there is no difference in the nutritional requirements of non-pregnant, non-lactating women as compared to men, except for iron in women of childbearing age, which need is adequately satisfied by the normal diet readily available and normally consumed. With the exception of iron, nutritional need is the same for men and women.

and nutrition societies. Main area of work: animal feeding. Sample publications: Vitamin B-12 Studies With the Hen; Some Effects of Growth Hormone Preparations in Pullets and Mature Hens; Antibiotic Levels in the Digestive Tract of the Chick; A Comparison of Growing Rations for Turkeys Reared in Confinement.

7. The defense also called Wallace L. Minto. It is abundantly clear from both direct and cross-examination that Mr. Minto is totally without qualification to testify as an expert on the issues presented here, and this court considers his testimony to be of no value whatsoever.

The quantities required for some nutrients differ depending on size, weight or activity, but this holds substantially true for both men and women. No reference is made in any of the labeling to conditions of pregnancy and lactation and any special need resulting.

With respect to iron content, both the men's formula and women's formula contain the same quantity of iron so that the "Vitasafe Formula W" and "Formula M" may be used interchangeably by either men or women with no difference in effect. All this is contrary to the implications of the labeling at issue.

2. The labeling of the seized *res*, when viewed in its entirety, does represent, suggest and imply that the nutritional value of Vitasafe capsules is enhanced by the presence in these capsules of the following ingredients in the stated amounts:

Vitamin K (Menadione) – .05 mg.
Monopotassium Glutamate – 20 mg.
L-lysine Monohydrochloride – 7 mg.
Sodium Caseinate (protein) – 100 mg. (Formula "M")
                        50 mg. (Formula "W")
Leucin – 8 mg. (Formula "M")
        4 mg. (Formula "W")
Lysine – 7 mg. (Formula "M")
        3.5 mg. (Formula "W")
Valine – 6 mg. (Formula "M")
        3 mg. (Formula "W")
Histidine – 2.8 mg. (Formula "M")
        1.4 mg. (Formula "W")
Isoleucine – 5 mg. (Formula "M")
        2.5 mg. (Formula "W")
Phenylalamine – 4 mg. (Formula "M")
        2 mg. (Formula "W")
Threonine – 4 mg. (Formula "M")
        2 mg. (Formula "W")
Tryptophan – 1 mg. (Formula "M")
        .15 mg. (Formula "W")
Manganese – 5 mg.
Potassium – 2 mg.
Zinc – .5 mg.
Magnesium – 3 mg.
Calcium – 75 mg. (Formula "M")
        50 mg. (Formula "W")
Phosphorous – 58 mg. (Formula "M")
        39 mg. (Formula "W")
Choline Bitartrate – 31.4 mg. (Formula "M")
        30. mg. (Formula "W")
Inositol – 15 mg. (Formula "M")
        10 mg. (Formula "W")
Lemon bioflavonoid – 5 mg.
Sulfur – 22 mg.
Royal Jelly – 550 mcg.

The evidence produced at trial proves that the normal or ordinary diet supplies amounts of the above-listed ingredients greatly in excess of those necessary for

good nutrition. Furthermore, with the exception of the fat soluble vitamins A and D, vitamins ingested in excess of those required are excreted and make no nutritional contribution. The evidence further proves that the following ingredients represented to be present in the Vitasafe product have no nutritional value whatever, namely rutin, lemon bioflavonoid, monopotassium glutamate, sulfur, choline bitartrate, inositol and royal jelly. Other ingredients, such as all the amino acids are in such small quantities as to be of no significant value when compared to the quantities of such ingredients which are required and which are present in the average diet. Because the ingredients here designated are either of no nutritional significance per se or are contained in the Vitasafe product in such minute quantities, these ingredients do not enhance the nutritional value of the Vitasafe capsules. Consequently, the representation and suggestion referred to in this finding is false and misleading.

3. The labeling of the seized *res* states and represents that the "Minimum Adult Daily Requirements" are a recommendation of the Food and Nutrition Board of the National Academy of Science National Research Council.

This representation is false. "Minimum Adult Daily Requirements" is a list of essential nutrients with designated amounts established by the United States Food and Drug Administration and set forth in their Regulations at 21 C.F.R. 125.3 (vitamins) and 125.4 (minerals).

The Food and Nutrition Board of the National Academy of Sciences has published its book, "Recommended Dietary Allowances." This is a list of nutrients with specified amounts, which differ in the number of nutrients listed and the amounts of such nutrients from those set forth as "Minimum Daily Requirements."

4. Although correct if read literally and carefully, the labeling of the seized *res* represents and suggests to the ordinary reader that it is necessary to eat enormous quantities and varieties of foods in order to obtain the variety of vitamins and minerals in the amounts provided by one Vitasafe capsule.

This representation is false and misleading because the variety and quantity of foods referred to in the labeling of the seized *res* provide many times the amounts of nutrients as well as additional nutrients than are supplied by one Vitasafe capsule.

5. The labeling of the seized *res* represents, suggests, and implies that Vitasafe capsules are an adequate and effective treatment of or preventive for the following symptoms and conditions which are referred to in this labeling: depression, tension, weakness, nervous disorders, lethargy, lack of energy, lassitude, impotence, aches and pains, aging, impaired digestion, loss of appetite, lesions and scaliness, night blindness, photophobia, fatigue, headaches, insomnia, diarrhea, edema of the legs, hypersensitivity to noise, swelling, redness, soreness and burning of the tongue, impairment of memory, inability to concentrate, dermatitis, cracking of the lips, lesions at the corners of the mouth, growth failure in children, sore, swollen and bleeding gums, defective calcification of the bones, lowered resistance to disease, and lowered vitality.

This representation is false and misleading. The evidence produced at trial conclusively proves that the above designated symptoms or conditions are caused by and associated with a great number of serious pathological diseases. Further, although some of these symptoms may be associated with vitamin and mineral deficiencies, the likelihood of their being caused by or associated with vitamin or mineral deficiencies in the United States today is very small.

There is a danger involved in the use of this type of labeling insofar as a person having one or more of the above-listed symptoms may resort to a Vitasafe product as a cure. Such a person may continue taking this vitamin product for a long continued period, as he is

urged to do in the labeling of this product, and thereby fail to obtain competent medical help to correct his physical illness.

6. The labeling of the seized article represents it to be of value because it contains "lipotropic factors." The evidence shows that such factors are substances which affect the mobilization of fat, particularly in the liver. Consequently, these factors are drugs within the meaning of 21 U.S.C. § 321(g) in that their only known use is to affect the structure and function of part of the body. Further, the labeling of the seized article fails to bear adequate directions for use of Vitasafe as a drug within the meaning of 21 U.S.C. § 352(f) (1). Nowhere in the labeling does there appear the conditions for which the Vitasafe capsule is to be used as a lipotropic factor or the collateral measures necessary for the safe use of Vitasafe by a layman as a lipotropic factor.

7. The article under seizure is both a food within the meaning of 21 U.S.C. § 321(f) because its labeling recommends its use as and represents it to be of value as a dietary and nutritional supplement, and also a drug within the meaning of 21 U.S.C. § 321(g) because its labeling recommends its use as and represents it to be of value as a curative or preventive of disease conditions in man affecting the structure and function of the body of man.

## CONCLUSIONS OF LAW

1. This court has jurisdiction of this action under the provisions of 21 U.S.C. § 334.

2. The *res* seized in this action is a food within the meaning of Section 201(f) of the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 321(f) and is also a drug within the meaning of Section 201(g) of the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 321 (g).

3. The approximately 3,370,000 items of written, printed, and graphic matter seized in connection with the Vitasafe products constitute labeling within the meaning of Section 201(m) of the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 321(m). See memorandum of this court incorporated by this case, supra, page 269.

4. Section 403(a) of the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 343(a), decrees that a food shall be deemed to be misbranded if its labeling is false or misleading in any particular. Section 502(a) of the same act, 21 U.S.C. § 352(a) decrees that a drug shall be deemed to be misbranded if its labeling is false or misleading in any particular. Any single false, misleading, exaggerated, ambiguous or overemphasized statement or representation in the labeling of either a drug or a food misbrands the articles within the meaning of either 21 U.S.C. § 343(a) or § 352 (a).

5. Section 502(f) (1) of the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 352(f) (1), decrees that a drug shall be deemed to be misbranded unless its labeling bears adequate directions for use. Adequate directions for use requires that the labeling of a drug contains directions under which the layman can use a drug safely, intelligently, and effectively and for the purpose for which it is intended, including statements of all conditions, purposes or uses for which the drug is intended or for which it is recommended or suggested in its labeling or advertising; as well as the quantity of dose, frequency, duration, time, and route of administration and preparation for use.

6. Section 304 of the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 334, provides, in part, that any article of food or drug that is misbranded when introduced into or while in interstate commerce or while held for sale, whether or not it is the first sale, after shipment in interstate commerce, shall be liable to be proceeded against while in interstate commerce, or at any time thereafter, in any district court of the United States within the jurisdiction of which the article is found.

7. The *res* seized in this action is misbranded as a food within the meaning of 21 U.S.C. § 343(a) and as a drug within the meaning of 21 U.S.C. § 352(a) because of false and misleading statements and representations in its labeling.

8. The *res* seized in this action is further misbranded as a drug within the meaning of 21 U.S.C. § 352(f) (1) because its labeling fails to bear adequate directions for use.

9. The *res* under seizure was misbranded when introduced into, while in, and while held for sale after shipment in interstate commerce, and must be condemned pursuant to 21 U.S.C. § 334.

10. Libelant is entitled to a Decree of Condemnation and the articles of food and drug and the labeling under seizure shall be destroyed pursuant to 21 U.S.C. § 334(d).

The Decree of Condemnation is granted with court cost, fees, storage and other proper expenses to claimant pursuant to 21 U.S.C.A. § 334(e).