713 F.2d 335
 NUTRILAB, INC., et al. and Bio-Tech Laboratories, Inc., et
al., Plaintiffs- Appellants,
v.
Richard S. SCHWEIKER, U.S. Secretary of Health and Human
Services; and Arthur Hull Hayes, Jr.,
Commissioner of the U.S. Food and Drug
Admin., Defendants- Appellees.
 Nos. 82-2746, 82-2747.
 United States Court of Appeals,
Seventh Circuit.
 Argued April 22, 1983.
Decided Aug. 8, 1983.
 
 Dennis M. Gronek, Dilling, Dilling & Gronek, Chicago, Ill., for plaintiffs-appellants.
 Thomas P. Walsh, Asst. U.S. Atty., Chicago, Ill., Don O. Burley, Office of Consumer Litigation, Dept. of Justice, Washington, D.C., Stephan D. Terman, Assoc. Chief Counsel, FDA, Rockville, Md., for defendants-appellees.
 Before CUMMINGS, Chief Judge, POSNER, Circuit Judge, and FAIRCHILD, Senior Circuit Judge.
 CUMMINGS, Chief Judge.
 
 
 1
 Plaintiffs manufacture and market a product known as "starch blockers" which "block" the human body's digestion of starch as an aid in controlling weight. On July 1, 1982, the Food and Drug Administration ("FDA") classified starch blockers as "drugs" and requested that all such products be removed from the market until FDA approval was received. The next day plaintiffs filed two separate complaints in the district court seeking declaratory judgments that these products are foods under 21 U.S.C. § 321(f) and not drugs under 21 U.S.C. § 321(g). The cases were consolidated and the government counterclaimed for a temporary restraining order, which was denied. At the close of the hearing on the preliminary injunction, the parties stipulated to advancing the hearing as a trial on the merits. On October 5, 1982, the district court held that starch blockers were drugs under 21 U.S.C. § 321(g), plaintiffs were permanently enjoined from manufacturing and distributing the products, and they were ordered to destroy existing inventories. Nutrilab, Inc. v. Schweiker, 547 F.Supp. 880 (N.D.Ill.1982). The portion of the order requiring destruction of the products was stayed pending appeal.
 
 
 2
 The only issue on appeal is whether starch blockers are foods or drugs under the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 301 et seq. Starch blocker tablets and capsules consist of a protein which is extracted from a certain type of raw kidney bean. That particular protein functions as an alpha-amylase inhibitor; alpha-amylase is an enzyme produced by the body which is utilized in digesting starch. When starch blockers are ingested during a meal, the protein acts to prevent the alpha-amylase enzyme from acting, thus allowing the undigested starch to pass through the body and avoiding the calories that would be realized from its digestion.
 
 
 3
 Kidney beans, from which alpha-amylase inhibitor is derived, are dangerous if eaten raw. By August 1982, FDA had received seventy-five reports of adverse effects on people who had taken starch blockers, including complaints of gastro-intestinal distress such as bloating, nausea, abdominal pain, constipation and vomiting. Because plaintiffs consider starch blockers to be food, no testing as required to obtain FDA approval as a new drug has taken place. If starch blockers were drugs, the manufacturers would be required to file a new drug application pursuant to 21 U.S.C. § 355 and remove the product from the marketplace until approved as a drug by the FDA.
 
 
 4
 The statutory scheme under the Food, Drug, and Cosmetic Act is a complicated one. Section 321(g)(1) provides that the term "drug" means
 
 
 5
 * * * (B) articles intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in man or other animals; and (C) articles (other than food) intended to affect the structure or any function of the body of man or other animals; and (D) articles intended for use as a component of any article specified in clauses (A), (B), or (C) of this paragraph; but does not include devices or their components, parts, or accessories.
 
 
 6
 The term "food" as defined in Section 321(f) means
 
 
 7
 (1) articles used for food or drink for man or other animals, (2) chewing gum, and (3) articles used for components of any such article.
 
 
 8
 Section 321(g)(1)(C) was added to the statute in 1938 to expand the definition of "drug." The amendment was necessary because certain articles intended by manufacturers to be used as drugs did not fit within the "disease" requirement of Section 321(g)(1)(B). Obesity in particular was not considered a disease. Thus "anti-fat remedies" marketed with claims of "slenderizing effects" had escaped regulation under the prior definition. See Food, Drugs, and Cosmetics: Hearings on S. 1944 before Subcomm. of Sen. Comm. on Commerce, 73d Cong., 2d Sess. 15-16 (1933) (Statement of Walter G. Campbell, Chief of FDA), reprinted in 1 Legislative History of Food, Drug and Cosmetic Act 105, 107-108 (hereinafter "L.H.F.D.C.A."). The purpose of part C in Section 321(g)(1) supra was "to make possible the regulation of a great many products that have been found on the market that cannot be alleged to be treatments for diseased conditions." Id.
 
 
 9
 It is well established that the definitions of food and drug are normally not mutually exclusive; an article that happens to be a food but is intended for use in the treatment of disease fits squarely within the drug definition in part B of Section 321(g)(1) and may be regulated as such. See, e.g., National Nutritional Foods Ass'n v. Mathews, 557 F.2d 325, 334 (2d Cir.1977); United States v. Hohensee, 243 F.2d 367 (3d Cir.1957) (tea leaves); United States v. 250 Jars of United States Fancy Pure Honey, 218 F.Supp. 208, 211 (E.D.Mich.1963), affirmed, 344 F.2d 288 (6th Cir.1965). See also S.Rep. No. 493, 73d Cong., 2d Sess. 2 (1934), reprinted in 2 L.H.F.D.C.A. 721, 722 (provision providing that the definition of food, drug, and cosmetic not be construed as mutually exclusive was deleted because language was superfluous); S.Rep. No. 361, 74th Cong., 1st Sess. 4 (1935), reprinted in 3 L.H.F.D.C.A. 660, 663. Under part C of the statutory drug definition, however, "articles (other than food)" are expressly excluded from the drug definition (as are devices) in Section 321(g)(1). Cf. United States v. "Vitasafe Formula M," 226 F.Supp. 266, 278 (D.N.J.1964) (article is food and drug; but it is unclear whether court applied drug definition in Section 321(g)(1)(B) or (C)). In order to decide if starch blockers are drugs under Section 321(g)(1)(C), therefore, we must decide if they are foods within the meaning of the part C "other than food" parenthetical exception to Section 321(g)(1)(C). And in order to decide the meaning of "food" in that parenthetical exception, we must first decide the meaning of "food" in Section 321(f).
 
 
 10
 Congress defined "food" in Section 321(f) as "articles used as food." This definition is not too helpful, but it does emphasize that "food" is to be defined in terms of its function as food, rather than in terms of its source, biochemical composition or ingestibility. Plaintiffs' argument that starch blockers are food because they are derived from food--kidney beans--is not convincing; if Congress intended food to mean articles derived from food it would have so specified. Indeed some articles that are derived from food are indisputably not food, such as caffeine and penicillin. In addition, all articles that are classed biochemically as proteins cannot be food either, because for example insulin, botulism toxin, human hair and influenza virus are proteins that are clearly not food.
 
 
 11
 Plaintiffs argue that 21 U.S.C. § 343(j) specifying labeling requirements for food for special dietary uses indicates that Congress intended products offered for weight conditions to come within the statutory definition of "food." Plaintiffs misinterpret that statutory Section. It does not define food but merely requires that if a product is a food and purports to be for special dietary uses, its label must contain certain information to avoid being misbranded. See United States v. Nutrition Service, Inc., 227 F.Supp. 375, 387 (W.D.Pa.1964), affirmed, 347 F.2d 233 (3d Cir.1965). If all products intended to affect underweight or overweight conditions were per se foods, no diet product could be regulated as a drug under Section 321(g)(1)(C), a result clearly contrary to the intent of Congress that "anti-fat remedies" and "slenderizers" qualify as drugs under that Section.
 
 
 12
 If defining food in terms of its source or defining it in terms of its biochemical composition is clearly wrong, defining food as articles intended by the manufacturer to be used as food is problematic. When Congress meant to define a drug in terms of its intended use, it explicitly incorporated that element into its statutory definition. For example, Section 321(g)(1)(B) defines drugs as articles "intended for use" in, among other things, the treatment of disease; Section 321(g)(1)(C) defines drugs as "articles (other than food) intended to affect the structure or any function of the body of man or other animals." The definition of food in Section 321(f) omits any reference to intent. But see United States v. Articles of Drug, No. CV74-L-136 (D.Neb. Sept. 1, 1976) (App. A-87 at A-92), where the court noted the intended use of the product in considering a defense that Zymaferm was a food. Further, a manufacturer cannot avoid the reach of the FDA by claiming that a product which looks like food and smells like food is not food because it was not intended for consumption. In United States v. Technical Egg Prods., Inc., 171 F.Supp. 326 (N.D.Ga.1959), the defendant argued that the eggs at issue were not adulterated food under the Act because they were not intended to be eaten. The court held that there was a danger of their being diverted to food use and rejected defendant's argument. See also H. Toulmin, A Treatise on the Law of Food, Drugs and Cosmetics, § 4.10 at 49 (1963).
 
 
 13
 Although it is easy to reject the proffered food definitions, it is difficult to arrive at a satisfactory one. In the absence of clearcut Congressional guidance, it is best to rely on statutory language and common sense. The statute evidently uses the word "food" in two different ways. The statutory definition of "food" in Section 321(f) is a term of art and is clearly intended to be broader than the common-sense definition of food, because the statutory definition of "food" also includes chewing gum and food additives. Food additives can be any substance the intended use of which results or may reasonably result in its becoming a component or otherwise affecting the characteristics of any food. See 21 U.S.C. § 321(s); United States v. An Article of Food ... Aangamik 15, 678 F.2d 735 (7th Cir.1982). Paper food-packaging when containing polychlorinated biphenyls (PCB's), for example, is an adulterated food because the PCB's may migrate from the package to the food and thereby become a component of it. Natick Paperboard Corp. v. Weinberger, 525 F.2d 1103, 1106 (1st Cir.1975); see also A. Herrick, 1 Food Regulation and Compliance 71 (1944) (although author states that a product need not have food value in order to qualify as a statutory "food," his examples are food additives or food components under § 321(f)(3), not 321(f)(1)). Yet the statutory definition of "food" also includes in Section 321(f)(1) the common-sense definition of food. When the statute defines "food" as "articles used for food," it means that the statutory definition of "food" includes articles used by people in the ordinary way most people use food--primarily for taste, aroma, or nutritive value. To hold as did the district court that articles used as food are articles used solely for taste, aroma or nutritive value is unduly restrictive since some products such as coffee or prune juice are undoubtedly food but may be consumed on occasion for reasons other than taste, aroma, or nutritive value. 547 F.Supp. at 883.
 
 
 14
 Defining food as articles used primarily for taste, aroma, or nutritive value would not be contrary to National Nutritional Foods Ass'n v. FDA, 504 F.2d 761 (2d Cir.1974). In that case, the FDA attempted to regulate as drugs all vitamin and mineral products in excess of the upper limits of the U.S. Recommended Daily Allowances ("RDA"). To bring these products within the Section 321(g)(1)(B) drug definition, the FDA had to show that the manufacturer's intended use was for treatment of a disease. Because the hearing record disclosed no food or nutrition use of nutrients at such high levels, the FDA inferred that the products were intended for therapeutic use. The court found first, that a significant number of persons have indisputable nutritional need for potencies exceeding the upper limits; and second, that to find actual therapeutic intent under part B of Section 321(g)(1) requires something more than evidence of uselessness as a food for most people. 504 F.2d at 789. This holding does not invalidate a definition of food that is based in part on consumption for nutritive value. See also United States v. "Vitasafe Formula M", supra, 226 F.Supp. at 278; United States v. Nutrition Service, Inc., supra, 227 F.Supp. at 385.
 
 
 15
 This double use of the word "food" in Section 321(f) makes it difficult to interpret the parenthetical "other than food" exclusion in the Section 321(g)(1)(C) drug definition. As shown by that exclusion, Congress obviously meant a drug to be something "other than food," but was it referring to "food" as a term of art in the statutory sense or to foods in their ordinary meaning? Because all such foods are "intended to affect the structure or any function of the body of man or other animals" and would thus come within the part C drug definition, presumably Congress meant to exclude common-sense foods. Fortunately, it is not necessary to decide this question here because starch blockers are not food in either sense.* The tablets and pills at issue are not consumed primarily for taste, aroma, or nutritive value under Section 321(f)(1); in fact, as noted earlier, they are taken for their ability to block the digestion of food and aid in weight loss. In addition, starch blockers are not chewing gum under Section 321(f)(2) and are not components of food under Section 321(f)(3). To qualify as a drug under Section 321(g)(1)(C), the articles must not only be articles "other than food," but must also be "intended to affect the structure or any function of the body of man or other animals." Starch blockers indisputably satisfy this requirement for they are intended to affect digestion in the people who take them. Therefore, starch blockers are drugs under Section 321(g)(1)(C) of the Food, Drug, and Cosmetic Act.
 
 
 16
 Affirmed.
 
 
 
 *
 The FDA urges an interpretation of the statute that would allow drug regulation of a product if, for example, an appetite suppressant were added to a recognized food. According to the FDA, addition of the drug might make it a "component" and therefore subject to regulation as a statutory "food". As such, the literal language of Section 321(g)(1)(C) would preclude regulation as a drug because the product would qualify as a statutory "food". Even if Section 321(g)(1)(C) meant only to exclude common-sense foods, an article might still be considered food unless addition of an appetite suppressant so changed its nature that it was no longer used primarily for taste, aroma or nutritional value. The FDA submits that a drug manufacturer could easily escape drug regulation by simply adding the drug to a food
 It is not necessary to resolve this problem in order to resolve this case. We merely note the possibility that the word "component" might be interpreted to exclude substances specifically added to a food to avoid bringing the substance within the drug definition, and, as noted above, a food may lose its food character if a drug is added.